# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Advanced Glassfiber Yarns LLC, <u>et al.</u>,<br><br>Debtors. | (Chapter 11)<br><br>Case Nos. 02-13615<br>and 02-13616 (JKF)<br><br>Jointly Administered |

### MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO <u>IMPLEMENT A KEY EMPLOYEE RETENTION PLAN</u>

**TO:** THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

This motion (the "<u>Motion</u>") of Advanced Glassfiber Yarns LLC ("<u>AGY LLC</u>") and AGY Capital Corp., debtors and debtors-in-possession (the "<u>Debtors</u>"), respectfully represents:

### SUMMARY OF RELIEF REQUESTED

1. The long-term success of the Debtors' operations depends largely upon their ability to retain key employees through the completion of these Chapter 11 cases and beyond. However, the commencement of these Chapter 11 cases has naturally engendered uncertainty and anxiety among the Debtors' employees, particularly their key senior and mid-level management employees. The Debtors believe that these key employees can and may pursue alternative employment opportunities unless they are offered an incentive to continue their employment with the Debtors. Accordingly, by this Motion, the Debtors seek entry of an order, substantially in the form annexed hereto (the "<u>Proposed Order</u>"), pursuant to Sections 105(a) and 363(b) of Title 11, United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq</u>. (the "<u>Bankruptcy</u>

Code"), authorizing the implementation of a key employee retention program (the "Retention Plan").[1] The purpose of the Retention Plan is to (i) minimize key employee turnover, (ii) motivate such employees throughout the pendency of these Chapter 11 cases and beyond, thereby ensuring that such personnel continue to provide essential management services during this critical period, and (iii) incentivize key employees of the Debtors to maximize the recoveries for the creditor constituencies. In the event that each of the key employees is eligible for payment under the Retention Plan, the Retention Plan will result in payment of Retention Bonuses and Performance Bonuses (each as defined below) in the maximum aggregate amount of approximately $2,500,000.

**JURISDICTION**

2. The Court has jurisdiction over this Motion under 28 U.S.C. § 1334, which is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

**A. Commencement of the Chapter 11 Cases**

3. On December 10, 2002 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 the Bankruptcy Code. Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their affairs as debtors-in-possession. The Debtors are jointly administering their estates solely for procedural purposes.

---

[1] In the ordinary course of the Debtors' businesses, they maintain certain pre-petition incentive,

4. On December 20, 2002, the Office of the United States Trustee appointed an official committee of unsecured creditors in these Chapter 11 cases.

B. **Background of the Debtors**

5. The Debtors are one of the largest manufacturers and global suppliers of glass yarns. The Debtors currently supply glass yarns to customers in Latin America, Asia, Canada, Europe and the United States. The Debtors operate primarily through AGY LLC, a Delaware limited liability company headquartered in Aiken, South Carolina.

6. AGY LLC was formed on or about July 1, 1998, when Owens Corning ("OC") contributed substantially all of the assets and liabilities comprising its glass yarns and specialty materials business to AGY LLC. Thereafter, OC sold a fifty-one percent (51%) ownership interest in AGY LLC to AGY Holdings, Inc., a wholly-owned subsidiary of Porcher Industries Group. The remaining forty-nine percent (49%) ownership interest in AGY LLC was retained by OC through a wholly-owned subsidiary, Jefferson Holdings, Inc.[2]

7. The Debtors sell their products primarily to glass yarn weavers who weave glass yarn into fabric that is used in a variety of end-user applications. Markets for glass yarns include the electronics, industrial and construction, and specialty markets. The Debtors' products fall into two general categories: (i) heavy yarns and (ii) fine yarns. Glass yarns are used for a wide range of applications such as printed circuit boards, roofing materials, filtration equipment, building reinforcement, window screening, aerospace materials and reinforced tapes. Fine yarns require a significant level of technical engineering, and generally command higher

---

bonus and severance plans. The amounts payable under the proposed Retention Plan will be in addition to any amounts payable to the Key Employees pursuant to any such plans as they may be in effect.

prices than non-specialty heavy yarns and are primarily used to construct laminates in multi-layer printed circuit boards.

8.  The Debtors employ approximately 1205 individuals (of which approximately 350 individuals are presently furloughed), and operate three manufacturing facilities located in Aiken, South Carolina; South Hill, Virginia; and Huntingdon, Pennsylvania. As of October 31, 2002, the Debtors, on a consolidated book-value basis, had aggregate assets and liabilities of $194.1 million and $409.0 million, respectively.

C. **Circumstances Surrounding the Chapter 11 Filings**

9.  Due in large part to a significant global economic downturn and inventory correction primarily in the electronics market, and a substantial increase in direct foreign competition resulting in part from a global underutilization of production capacity, the Debtors experienced a substantial decline in sales and operating income during its 2001 fiscal year. For example, sales and operating income decreased approximately twenty-six percent (26%) and forty-four percent (44%), respectively, between fiscal years 2000 and 2001.

10. As a result of this sharp decline, the Debtors found themselves significantly overleveraged, with current and projected income insufficient to support the Debtors' present level of debt. To combat these negative effects, during 2001 the Debtors began implementing a series of cost reduction measures. These measures included an approximately forty-four percent (44%) reduction in the Debtors' salaried and wage workforce, substantial reductions in production schedules and capital expenditures, elimination of certain benefit programs for salaried employees and other measures.

---

[2]  OC, Jefferson Holdings, Inc. and certain other affiliates thereof, are presently the subject of separate

11. Notwithstanding these efforts, the Debtors' liquidity difficulties continued. During 2001 and 2002, the Debtors experienced certain financial covenant defaults with respect to approximately $180 million of indebtedness owed under a senior secured revolving credit and term loan facility (the "Credit Facility"). In addition, AGY LLC was unable to make a July 15, 2002 interest payment in respect of its $150 million of 9⅞% senior subordinated notes due 2009 (the "Notes"), resulting in the formation of an *ad hoc* committee of certain holders of the Notes (the "Informal Note Committee"). Subsequently, AGY LLC was unable to make a scheduled principal payment due under the Credit Facility on September 30, 2002, and a scheduled interest payment due at the end of November, 2002. As a result of such covenant and payment defaults, the Debtors and their pre-petition secured lenders (the "Pre-Petition Lenders") entered into various waiver, amendment and forbearance agreements. Pursuant to such agreements, among other things, the Pre-Petition Lenders agreed to forbear from exercising rights and remedies under the Credit Facility under certain terms and conditions, in consideration of certain concessions by the Debtors including, increases in the Debtors' cost of borrowing and reductions in the Debtors' borrowing availability and capacity.

12. In light of their financial difficulties, prior to the Petition Date, the Debtors engaged in extensive negotiations with representatives of the Pre-Petition Lenders, the Informal Note Committee and other parties in an effort to achieve an agreement respecting a consensual restructuring of the Debtors' indebtedness and liabilities. In connection with such negotiations, and in light of the previously scheduled retirement of AGY LLC's then-president, in October, 2002 the Debtors engaged the Carl Marks Consulting Group LLC ("Carl Marks") as turnaround

---

Chapter 11 cases pending in this judicial district.

and management consultants. Marc Pfefferle and Gary Bernhardy of Carl Marks were appointed as Chief Restructuring Officer and Chief Operating Officer, respectively, of the Debtors.

13. Under the guidance of Messrs. Pfefferle and Bernhardy, the Debtors undertook a comprehensive bottoms-up analysis of their operations and finances, and in or around mid-November, 2002, formulated a revised business plan for the Debtors that served as the basis for continued pre-petition restructuring negotiations. Although the Debtors believe that substantial progress was made during such pre-petition negotiations, the parties were unable to reach an agreement prior the expiration on December 6, 2002 of the Debtors' forbearance agreement with their Pre-Petition Lenders.

14. Accordingly, the Debtors commenced the instant Chapter 11 cases to further stabilize their day-to-day operations and finances, and to obtain a moratorium of their indebtedness while continuing to pursue strategic restructuring negotiations with their major creditor and other constituencies. The Debtors believe that, under the protection of this Court, they will be able to restructure their indebtedness and propose a plan of reorganization consistent with the provisions of Chapter 11.

**IMPLEMENTATION AND APPROVAL OF A KEY EMPLOYEE
RETENTION PLAN IS NECESSARY AND WARRANTED**

15. The Debtors' ability to maintain their business operations and preserve value for their estates is dependent upon the continued employment, active participation and dedication of employees who possess knowledge, experience and skills necessary to support the Debtors' business operations. From a total current salaried employee base of approximately 143, the Debtors have identified 42 members of their senior and mid-level management team (the

"Key Employees") that provide critical services related to the Debtors' financial, operational, engineering, information technology and general management functions. The Debtors' ability to stabilize their business operations and assets and their reorganization prospects will be hindered substantially if the Debtors are unable to retain the services of the Key Employees.

16. The morale of the Debtors' employees has already been negatively impacted by the Debtors' pre-petition financial difficulties and substantial pre-petition layoffs.[3] The Debtors' salaried employees have not received salary increases in more than a year (and for certain employees in almost two years) and no such increases are contemplated in the Debtors' 2003 operating plan. In addition, prior to the Petition Date, the Debtors ceased making 401(k) contributions and increased health insurance co-payment amounts for employees. Further, immediately prior to the Petition Date, the Debtors amended their severance plan to, among other things, reduce the maximum benefit payable from 12 months salary to three months salary (with the exception of employees at the level of vice president and above who can receive a maximum of six months salary). Accordingly, the Debtors believe that the uncertainty surrounding these Chapter 11 cases and general concerns regarding the risk of loss of employment and the decline of employee morale remain high. The Debtors' executives and managers have already experienced a significant increase in their workload and responsibilities in a difficult and demanding work environment. Further, the attendant uncertainty surrounding these Chapter 11 cases has prompted understandable concerns among such executives and managers over limited compensation opportunities and employment security.

---

[3] In the year prior to the Petition Date, more approximately 48 salaried employees were terminated by the Debtors, including 22 in the days shortly prior to the Petition Date.

17. Therefore, unless a retention plan is implemented, there is considerable risk that the Key Employees will (or have) initiated searches for alternative employment opportunities if not assured of the continuity of their employment or given an incentive aimed at securing their retention through the completion of these Chapter 11 cases and beyond. Although as of the filing of this Motion no Key Employee has left the Debtors, the Debtors' personnel have been aware that the Debtors were developing and would be seeking approval of a key employee retention program and this knowledge has helped retain the Key Employees to this point.

18. In addition, there would be significant costs to the Debtors associated with the loss of the Key Employees including recruiting costs, time lost to training, not to mention the premium compensation that would have to be paid to attempt to attract new employees to a Chapter 11 company. The Debtors can ill afford such costs or the time lost in dealing with such matters. Further, the Debtors believe that the loss of even a few of the Key Employees could lead to the loss of many more. Retaining the Key Employees is crucial to the success of the Debtors' reorganization efforts because it will prevent the Debtors from losing employees with institutional knowledge, as well as established relationships with the Debtors' critical vendors, customers and others.

19. In summary, the purpose of the Retention Plan is to: (i) demonstrate to the Key Employees that they are valued by the Debtors, (ii) allay the concerns of the Key Employees about unexpected layoffs and boost morale, and (iii) encourage the Key Employees to remain with the Debtors through the completion of these cases and to work diligently toward their successful conclusion and beyond.

A. Development of the Retention Plan

20. The proposed Retention Plan was developed under the express direction of the Carl Marks management team.[4] In developing the Retention Plan, the Debtors along with their professionals advisors, considered various alternatives and worked diligently with their professionals to develop the Retention Plan, which they believe is necessary to retain the Key Employees and which is comparable to the type of retention plans adopted in other Chapter 11 cases.

B. Terms of the Retention Plan

21. To incentivize the Key Employees to remain with the Debtors and to help facilitate the Debtors' successful reorganization, the Debtors will pay retention bonuses aggregating six months salary (each, a "Retention Bonus") in installments to those Key Employees that remain with the Debtors through three target dates as set forth below. As mentioned above, the Retention Plan covers 42 members of the Debtors' senior and mid-level management (out of a pool of approximately 143) that the Debtors believe are critical and necessary to their successful reorganization.[5]

---

[4] No member of the Carl Marks management team will participate in the Retention Plan.
[5] To maintain confidentiality, the identity of the Key Employees and the Retention Bonus amounts allocated to each such employee will be provided to the official committee of unsecured creditors and the Debtors' pre- and post-petition secured lenders. At the hearing on this Motion, this information can also be provided to the Court.

22.     Under the Retention Plan, Key Employees are entitled to a Retention Bonus if such Key Employee remains continuously employed by the Debtors as follows:

| Payment Date | Retention Bonus Percentage | Maximum Aggregate Amount of Retention Bonuses Payable |
|---|---|---|
| December 31, 2003 | 20% | $415,000 |
| June 30, 2004 | 20% | $415,000 |
| December 31, 2004 | 60% | $1,250,000 |

23.     In addition, a Key Employee also will be entitled to a Retention Bonus if such employee is terminated by the Debtors without Cause, in which event such employee will be entitled to retain any prior Retention Bonus installment that had been earned plus the next scheduled installment (if any) but shall not be entitled to any other Retention Bonus payment.[6] However, if a Key Employee voluntarily leaves the company, or is terminated by the Debtors for Cause, prior to a payment date such employee shall forfeit and not be entitled to any additional Retention Bonus payment (but shall be entitled to retain any prior Retention Bonus installment previously earned and paid).

24.     Further, the Retention Plan provides for a partially accelerated Retention Bonus payment in the event that the Debtors (i) emerge from Chapter 11 prior to September 30, 2003, and (ii) have generated plan levels of budgeted EBITDA and free cash flow for the year-to-date period then ended.  In such event, an eligible Key Employee shall be paid on the effective date of a plan of reorganization one-third (⅓) of the installment that otherwise would have been

---

[6]     The term "Cause" shall mean grounds for dismissal applying the Debtors' customary standards.

paid on December 31, 2004, with the remaining Retention Bonus amounts to be paid as set forth in paragraph 22 above.[7]

25. In addition, the Retention Plan provides for approximately $420,000 to be paid to top performing Key Employees as performance-based bonus payments (each, a "<u>Performance Bonus</u>") at the sole discretion of the Debtors' Chief Executive Officer, however, such discretionary amount would be increased by any amount which would have otherwise been payable to a Key Employee who voluntarily leaves the Debtors or is terminated for cause prior to a payment date.

## APPLICABLE AUTHORITY

A. <u>The Retention Plan Should be Approved Under Section 363(b) of the Bankruptcy Code</u>

26. Section 363(b) provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A court can authorize a debtor to use property of the estate outside of the ordinary course pursuant to Section 363(b)(1) of the Bankruptcy Code when there is a "sound business purpose" that justifies such use. <u>See</u> <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983); <u>In re Delaware & Hudson R.R. Co.</u>, 124 BR. 169, 176 (D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to Section 363(b)); <u>see also</u> <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to

---

[7] In the event that the Debtors are not successfully reorganized, a "carve-out" of $250,000 has been reserved for vested and earned bonuses payable under the Retention Plan pursuant to this Court's final order dated January 13, 2003 authorizing the Debtors to incur post-petition financing.

Section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (approving employee Retention Plan under sound business purpose test as discussed in Lionel).

27. In addition, in the context of operating under Chapter 11, the establishment of an employee retention program for key employees pursuant to Section 363(b)(1) of the Bankruptcy Code has routinely been authorized by courts in this District. See e.g., In re Tandycrafts, Inc. et al., No. 01-1764 (MFW) (Bankr. D. Del. August 15, 2001); In re Lernout & Hauspie Speech Prods. N.V., et al., No. 00-4398 (JHW) (Bankr. D. Del. April 10, 2001) (authorizing key employee retention program of approximately $11.1 million for 533 employees); In re Fruit of the Loom, Inc., et al., No. 99-04497 (PJW) (Bankr. D. Del. March 27, 2000) (authorizing and approving key employee compensation plan of approximately $8.4 million for 132 key employees); In re MMH Holdings, Inc., et al., No. 00-2027 (SLR) (Bankr. D. Del. June 26, 2000 as modified by order dated Aug. 8, 2000) (authorizing employee retention program); In re Sun Healthcare Group, Inc. et al., No. 99-3657 (MFW) (Bankr. D. Del. Dec. 15, 1999) (authorizing $6 million pool from which retention and incentive payments made); In re Harnischfeger Industries, Inc., et al., No. 99-2171 (PJW) (Bankr. D. Del. Sept. 30, 1999, amended October 8, 1999) (approving retention program); In re Loewen Group International, Inc. et al., No. 99-1244 (PJW) (Bankr. D. Del. Sept. 21, 1999) (same); In re Long John Silver's Restaurant's, Inc., No. 98-1164 (PJW) (Bankr. D. Del. Aug. 18, 1998) (same).

B.     The Retention Plan Should be Approved Under Section 105(a) of the Bankruptcy Code

28. Section 105(a) provides in pertinent part that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

29. As described in detail above, the Debtors believe that the implementation of the Retention Plan will accomplish a "sound business purpose" and aid the Debtors' reorganization. Based upon their own experience and their evaluation of other alternatives in conjunction with their professional advisors, the Debtors have determined that the measures proposed herein will achieve their intended purpose of retaining their valuable employees and focusing them on the goal of a successful reorganization through the completion of these cases.

### ALLOWANCE OF ADMINISTRATIVE EXPENSE PRIORITY

30. Since the Retention Bonuses are needed to retain employees — who are in turn necessary for the preservation for the Debtors' estates — the payment rights of the Key Employees are "actual, necessary costs and expenses of preserving the [Debtors'] estate[s]" and should be accorded administrative expense status to the extent that they become due in accordance with the criteria described above. 11 U.S.C. §§ 503(b)(1)(A), 507(a)(1).

### CONCLUSION

31. In light of the foregoing, the Debtors believe that the incentives provided under the Retention Plan are reasonable and appropriate and will enhance the Debtors' ability to retain all of the Key Employees, who are crucial to the Debtors' successful reorganization efforts.

32. Notice of this Motion has been given to: (i) Office of the United States Trustee; (ii) counsel to the Official Committee of Unsecured Creditors, (iii) counsel to the Debtors' pre-petition and post-petition secured lenders; and (iv) all parties on the Master Service

List.  The Debtors respectfully submit that such notice is sufficient, and request that this Court find that no further notice of the relief requested herein is required.

33. No previous motion for the relief requested herein has been made to this or any other Court.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order annexed hereto authorizing the Debtors to implement the Retention Plan and granting such other relief as is just and proper.

Dated: Wilmington, Delaware
January __, 2003

**PROSKAUER ROSE LLP**
Alan B. Hyman (AH 6655)
Scott K. Rutsky (SR 0712)
1585 Broadway
New York, New York 10036
(212) 969-3000

-and-

**COZEN O'CONNOR**

/s/ Mark E. Felger
Mark E. Felger
Chase Manhattan Centre
1201 North Market St.
Suite 140
Wilmington, DE 19801
(302) 295-2000

Co-Counsel to the Debtors and
Debtors-in-Possession

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Advanced Glassfiber Yarns LLC, <u>et al.</u>,<br><br>Debtors. | (Chapter 11)<br><br>Case Nos. 02-13615<br>and 02-13616 (JKF)<br><br>Jointly Administered |

### ORDER PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO IMPLEMENT A KEY EMPLOYEE RETENTION PLAN

**UPON** the motion (the "<u>Motion</u>")[8] of the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), seeking entry of an order, pursuant to Sections 105 and 363 of Title 11, United States Code, 11 U.S.C. §§101 <u>et</u> <u>seq</u>. (the "<u>Bankruptcy Code</u>"), authorizing the Debtors to implement a Retention Plan; and it appearing that no further notice of the relief requested in the Motion is required; and it appearing that it is in the best interests of the Debtors' estates for the Debtors to implement the Retention Plan as described in the Motion; and sufficient cause appearing therefore; it is hereby

**ORDERED**, that the Motion is granted; and it is further

**ORDERED**, that the Debtors are authorized to implement the Retention Plan as set forth in the Motion; and it is further

**ORDERED**, that the Retention Bonuses to which an employee is entitled under the Retention Plan shall be deemed allowed administrative expenses of the Debtors pursuant to Section 503(b) of the Bankruptcy Code; and it is further

---

[8] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

**ORDERED**, that the Debtors may take all steps necessary or desirable to effectuate the terms of this Order or the Retention Plan.

Dated: _____, 2003
        Wilmington, Delaware

                                                    Honorable Judith K. Fitzgerald
                                                    United States Bankruptcy Judge

WILM1\16717\1 132070.000